County這一곳 derives from Japanese service names Skeia Shirome Fukami and Shinne    Made in Gumbi in Indonesia. Mr. Rounds, you may begin when you're ready. Thank you, Your Honor. May it please the Court? The first issue this panel needs to address is whether it was procedurally proper for the lower court to decide Reno's J-Mall motion after trial. Now, the court indicated both at the summary judgment stage and on two different days in trial, day five and day six, that there were factual disputes on the on-sale bar in this case. Whether there was an offer for sale and whether or not it was ready for patenting. When the last ruling was made on day six, that was in response to Eberle's J-Mall motion. And at that time, the court clearly indicated that there was a factual dispute for the same reasons that there was a factual dispute when Reno had made that motion at the close of Eberle's case. So Judge Campbell could not have been more clear at that time that this case was going to go to the jury. Very little evidence, and none of it related to the on-sale bar, came in after his ruling on day six. The only testimony that came in after that was related to damages and a very small amount related to the G90 prior art. In that factual context, it made absolutely no sense for Reno A&E to renew its motion after the close of all evidence. The judge had made very, very clear that this case was going to go to the jury. This case is just like the Boynton case out of the Sixth Circuit. In that case, there's a failure to make a J-Mall motion. It didn't really make any difference. I mean, you got a new trial motion here under Rule 59. Everybody agrees with that. The real focus here is whether there was evidence to substantial evidence to support the jury verdict. And the problem is that you say that the offer that was made wasn't a commercial offer for sale because it wouldn't have created a contract if it had been accepted. If the offer had been made the day before the critical date, when, as I understand it, the particular device had actually been put into production, right? No, that's not correct, Your Honor. Not the day before the critical date? No. This product was not in production until the date of the October 15th and October 22nd impulses. Well, I thought they were producing items in April. No, that's not correct, Your Honor. The only evidence in the record is the April 22nd, 1996 letter from Mr. Potter to Electromega. And at that time, a few units had been put in the ground and connected to loops to test them. Okay, so if I was incorrect in saying they were in production, there were at least units that were being produced for testing purposes. Yes, the issue is whether or not those contained the claimed elements of the claimed invention in this case, and they clearly did not. Because? It was Everly's burden to prove, with clear and convincing evidence in this case, that all the elements of the claimed invention were ready for patenting prior to the critical date. That evidence is completely absent. Well, let's assume it was ready for patenting, okay? What was it that was missing from the devices that were being produced on that date? Which of the claim limitations? There was no evidence at trial that the oscillator circuit for the means for detecting Step-Fourth in Claims 1 and 31 was present in that device. And there was no evidence whatsoever that the display of loop inductance change, what's been referred to by the parties as delta-L percentage, was in that device and that it could display that. The record is completely absent of those two critical components being completed or being ready for patenting or even existing as they're set forth in the patent prior to the critical date. But as the court knows, there's two prongs here. That's ready for patenting, which we think there is no substantial evidence to find for the jury to have found that it was ready for patenting. But it is so crystal clear on this record that the February 21st letter from Mr. Potter to Electromega under this court's precedent, under Group 1, Lanier, under the Plumtree case that was recently decided, it is so clear under those cases that that letter cannot be an offer for sentencing. Let's assume that the device actually existed in February, the time the letter was written. The device existed. The potential buyer had no clue as to exactly what it was other than that it was supposed to perform this function. And there was an offer to sell it at that time. It really doesn't make any difference, does it, whether the buyer knew what it was that was being offered as long as the offer was clear enough as to what it was that was being offered. It doesn't have to describe the claim limitations in the offer itself, right? I don't believe that's correct under Lanier. And the reason is that I believe Electromega had to know what they were buying. So if, in fact, the offer— Why? I mean, it's an offer for sale, even if it's an offer to somebody who has never heard of your company before, isn't it? Electromega? Well, I mean, why does it matter that the recipient of the offer knows something if the offer is clear enough as to what it covers? Lanier discussed the two components. It discussed the component of the offer, and then it discussed the component that the only thing that would need to happen is that there be mere acceptance on the part of the purchaser. And in this case, in response to the hypothetical, I don't believe they would know what they're accepting. Does that make any difference? Perhaps it doesn't, but ultimately you go back to whether or not the offer was specific enough to create a contract so that the purchaser—in this case, it would have been Electromega—could say, okay, we got a deal. And that is what is clearly absent in this record. But, Mr. Rounds, the shipping that was done in October of 1996, the shipment, made a reference to the order of February of 1996? Yes, it did. So what was that shipping fulfilling? Was it fulfilling the order of February 20th of 1996? No, it wasn't. So why was it made a reference at that point in time? Well, as Mr. Potter testified and as the record clearly showed, it was ceremonial because Electromega wanted to be the first company that purchased a product from Reno AD. But the record was very clear in trial that those invoices were in response to the August 11th purchase orders from Electromega. And the court need only match them up because the quantity of $300 was the same, the price was the same, $97.50. The delivery was set forth as mid-October, which Reno AD complied with. So the objective evidence was very, very clear that the October 17th and 25th invoices were in response to those purchase orders. But the purchase order for August was $300, right? You only shipped $200 in October, which was the purchase order back in February. No, that's not correct, Your Honor. That was an argument that was made at trial, but in fact there are three invoices in the record that show $300. Where? And I can give the court the citations of those. They are at 3752, 3755, and 3986. The 3986 invoice clearly sets forth the extra $100 that the court is referring to. So these match up perfectly instead to the February purchase order for a totally different product, the 292. These match up specifically with the August invoices. But I'm prepared to go even farther here. Let's take Eberle's case at its absolute best here. Eberle says it was in response to the February 20th purchase order because it's referred to in the invoices. That cannot convert Mr. Potter's letter to an offer for sale because the letter doesn't specify the information that appears in the invoices. It doesn't specify a price. It doesn't specify a quantity. It doesn't specify delivery dates. It doesn't even specify the product. There is no way as a matter of law that that February 21st letter can be construed as an offer for sale under this court's precedent. I see my yellow light is on. Thank you. Thank you. Mr. Bagatelle. I'm Bagatelle on behalf of the Eberle Cross Appellants. I'm going to start with the direct appeal issues, but I would like to spend a couple of minutes on the cross appeal, and I've reserved two minutes to address those. Your cross appeal is not proper, is it? Yes, Your Honor, I do believe it is. Well, how does it expand the scope of the judgment? Because the judgment itself finds that the pattern is not invalid due to anticipation and obviousness. But it invalidates it on an on-sale bar. What difference does it make that you're urging an alternative ground for invalidation? Under Bailey, Typewright, all these cases where we've limited cross appeals to claims that the judgment should be expanded, how can this possibly fit under that? Your Honor, we specifically asked the district court to take that out of the judgment on that ground, and the district court declined. You're not responding to my point. The point is this patent was invalidated on grounds of on-sale bar. The fact that you're urging an alternative ground to invalidate the patent doesn't expand the judgment. I agree that if the judgment is construed as the patent being invalid, I definitely agree with that. In that sense, it's an alternative ground. But because the judgment specified the ground on which it was invalid, I felt that I had to cross appeal. You don't have to cross appeal unless you're asking for more than you got before. And what you got before was a judgment of invalidity, assuming there aren't other claims on which the on-sale bar didn't reach. But as I understand this record, there aren't. That's correct, although the judgment said it was invalidity due to the on-sale bar. But that doesn't matter. The judge could have said it's invalid because I got up on the wrong side of the bed this morning. If the judge entered a judgment of invalidity with respect to all the claims in dispute, then everything else that you have to raise by way of showing why that judgment is correct isn't a cross appeal in that. That's fine, Your Honor. I'm happy to address it all right now, if need be. I'd like to spend one minute on the Jamal issue and then get directly to the merits. The first point that Mr. Rounds made was that there's no distinction between Everly's motion and Reno's motion. Of course there's a distinction. There's a distinction between which party has moved for judgment as a matter of law. In this case, Reno moved at the close of the plaintiff's case. Under Ninth Circuit law, it's very clear that that's not good enough. The district court invited them to move at a later point in trial. They elected not to do so. There have been rules in other circuits. There's a new rule that's going to take effect for trials starting now. But this trial occurred within the Ninth Circuit and in 2005. But the main issue here is whether this was a commercial offer for sale. What they're saying is that this product was still in development in February. There couldn't have been an offer for sale because the product wasn't concluded at that point, and therefore it could have been changed. So what's the answer to that? There are two arguments they're making. One is the specificity of the offer in terms of the terms and conditions. And the second is essentially an aspect of ready for patenting, how far along the product was. And I'll take those in turn. I don't think it's the same thing. Let's assume, put aside the ready for patenting, because that doesn't require the thing be reduced to practice. Let's assume that the ready for patenting prong is satisfied. We're dealing with a commercial offer for sale. They say it was still in development, it wasn't finished, you couldn't make a binding contract with an offer to sell something that was still in development. What's the answer to that? I think the answer to that is that there's a distinction between a product that is ready for shipment and an invention that is ready for patenting. The invention here was relatively simple. It simply required a means for detecting, manually actuatable function, essentially a keypad. And third, it required an active variable display. They clearly were offering that for sale. They were tweaking various aspects such as the oscillator, various precise little things about the hardware and software. Those were not claimed in the invention. But how do we, I'm not sure that that's entirely dispositive in the sense that you can only offer to sell something which is a complete product. Even if something didn't correspond to a claim limitation, if it was missing, there might still not be an offer to sell the product. There was an offer to sell a product that contained all the limitations of Claims 1 and 31 and the other claims. How do we know that? How do we know that? You can take a look at both the correspondence and the internal documentation. Well, the correspondence doesn't describe the product in sufficient detail for us to know whether it's the same thing as the patented invention. Well, actually, the correspondence, Your Honor, states that he's planning to produce a 222 style detector. And he's planning to produce it with some custom components that include LCDs. So we know that it's a vehicle detector. We know it's got an integral LCD. We know from the Model C documentation, which was dated February 11th or 13th, I can't remember precisely, basically what the software was going to do and what the hardware was going to do. It showed that the vehicle detector was going to show parameter, parameter values. It was going to show function states. We have clear evidence from that Model C documentation. Plus, we have the LCD diagram itself from standards that shows that they had this product. It was already laid out. It had the displays that showed all these different values. We have testimony from the inventor, one of the co-inventors, Mr. Seabird, who said that he knew that the product would work for its intended purpose. Well, how do we know that that's what's being offered? That's the problem. Because Mr. Potter himself testified that that was the only product they were working on at the time. The only product they were working on was a product that became Model C. In fact, they were referring to it internally as Model C. Well, did he testify that this was an offer to sell this particular product? He testified that Reno wanted to buy it. He wasn't yet ready to deliver. But what we have from the offer letter itself was— No, no, but answer my question. Yes. Suppose we find the offer letter is not sufficiently specific on its face, the way we did in plummeter. We said it's not sufficient. Was there testimony here that what was meant by the offer letter was the particular product that was ultimately the subject of the patent? Yes, Mr. Potter so testified. Is this the testimony about the 222 equals the Model C? Yes. This is at JA 1982. Is that what you're referring to? I believe so. I'll have to double-check the precise page. That's where he's asked about the 222. He said, well, that means the Model C. Yes. He was fighting it unpersuasively, but he ultimately conceded that that was the product to which he was referring. What he was trying to say was he was still tweaking the Model C. I'm sorry. I misspoke. He refers to the Model C. He doesn't refer to it as the 222. I'm sorry. But this is the right area, I think, 1981 through 1982, where he talks about the Model C as being the subject of this. I believe so. I can check. Why don't you check so we make sure? I think I may have thrown you off there. Ultimately became the Model C. Yes. Right. Yeah. Okay. But saying that that's what ultimately became the Model C is not quite the same thing as saying that's what he was offering to sell in February. What he was offering to sell was a 222-style detector that contained an integral LCD display. The only product he was developing at the time was the product that became the Model C. I don't want to get hung up on the words Model C because the question is whether the invention was ready for patenting and not whether the words Model C were a model for sale. No, no. We're not dealing with the question of whether the invention was ready for patenting. We're dealing with the question of whether the offer was a commercial offer for sale that could be accepted. And that would seem to depend on the state of development of the product, whether at that time that he was offering it, it had been sufficiently developed so that it would satisfy the requirements of contract law. Yes. And I believe we have testimony from the co-inventor that the product was well-developed. We have testimony from – actually, we have Model C documentation that was before that date of that letter showing that they knew what the functionality was going to be. Which letter are you referring to, the February 21st letter? The February 21st letter, which in turn refers back to the letter of February 20th, which identifies – in fact, in the February 21st letter itself it refers to 200 Model 222C detectors that he could not provide at that time, but he was willing to provide them at a later date. And he gave the precise dates. I can give you samples by May. I can give you commercial quantities by July. By July. And he didn't want to promise anything earlier because he wasn't sure he was going to be able to deliver. The implication, or at least the jury was entitled to find the implication, was that he was willing to commit at that time to develop a 222 style detector with an integral LCD. The fact that the software was not yet finished is irrelevant, and that's right out of your robotic mission systems case. The fact that you don't have a single document is also irrelevant. The question is whether there was an offer for sale and whether it was ready for patenting. And this Court has held in Van Moore that you're entitled to look at all of the evidence together. I'm sorry. I just looked at the testimony on those pages, but I don't see on those pages the testimony that the product that he was offering to sell had been developed to the point where it satisfied the claim limitations. How do I know that that's the product he was offering to sell? Okay. The claim limitations require a vehicle detector, which has three elements. It has a means for detecting. You can get that right out of the Model C documentation that it's going to be connected to something. You even have the hardware pinouts in the Model C documentation. You have to have function keys, which that, I believe, you can see both from the testimony… But this is you. Who was the witness who testified about this? It's not for us to sit here and listen to argument about that it was complete. We have to find testimony by somebody that said that it was sufficiently complete at that point, that it was something that satisfied all the claim limitations. Is there such testimony? I think you can get testimony out of Mr. Seabury, who testified that it was far enough advanced to where you could connect the display to the detection circuitry. That's right out of Mr. Seabury's testimony. And, again, Mr. Seabury also testified to his drawing his mock-up of what the display and the detector would look like. That was actually dated just a couple of days later. That's at the end of February. I can give you the citation for that. The Seabury drawing is at 3731. We have the standard schematic at 3710. The Model C documentation is at 3732-39. And we have the Model C marketing brochure, 4045. Is what you're telling me that nobody pulled this together and said at this point the Model C was sufficiently developed so that it satisfied all the claim limitations? Mr. Seabury was asked that, and he gave that answer, yes. He testified that each one of those three limitations in claims 131 were present. Where's that? Mr. Seabury's testimony. I believe it's at 2292-2293. Thank you. I think it's also in the following pages as well. One other side I have is 3710. Mr. Seabury was one of the co-inventors, and he testified via deposition testimony, which was read into the record. Let me turn to two of the other issues that Mr. Morales mentioned, in particular the oscillator circuit and the delta-5% issue. The oscillator circuit was simply not – the particular oscillator circuit that Reno used was not a requirement of the claims. And the means for detecting simply required a microprocessor and an oscillator circuit. And that was testified to by none other than Reno's own expert at trial. The district court didn't say anything to the contrary. But Reno's expert testified that it merely required a microprocessor and an oscillator circuit. The more detailed description appears later in the patent. At the beginning, you can look at Figure 1 and the text accompanying it, and it shows them as generically an oscillator circuit and a microprocessor. Later on, in connection with Figure 4, there's a description of a very detailed oscillator circuit that Reno tried and failed to patent. So that description is simply not required by the claims. Did the district court construe the claims so that everybody knew what was required? Yes, Your Honor, and he said that the means for detecting is the microprocessor and oscillator as described in the specification. And as described in the specification, it is described generically in Figure 1 and the text accompanying Figure 1. The fact that there's also a more detailed oscillator circuit later on doesn't mean that that was the details that were required. In fact, that would have been an extraordinarily narrow claim to require all those very minute details. And, of course, the same construction governs for infringement as it does for invalidity. That's why this argument wasn't really made at trial. It's an argument made on appeal to trial salaries. But was the jury charged about what oscillator circuit was required? It said the microprocessor and oscillator circuit as stated in the specification. It was no more delineated. And there was no request for any more detail? No. No, there was not, Your Honor. Do you want to say a word about the Delta L and then we're going to have to move on? Yes, Your Honor. The Delta L over L claims were basically a translation between the level of sensitivity back into their raw value in terms of the percentage change in inductance. What the testimony was was that they had considered Delta L over L all along. In fact, it's in the manual that they correlate a level of sensitivity with a value of Delta L over L. But the original display that was developed in December didn't actually contain Delta L over L itself. And that at some point when Mr. Parker got the displays, he said, geez, we really ought to display the raw values. But they clearly conceived of Delta L over L and why it was important to display it. The question was, was it in the physical environment? And that's just not relevant to the on-sale bar issues. The question is when it was ready for patenting. And at a minimum, Your Honor, it was obvious in light of what was on sale as of the critical date. Because Delta L over L, the raw value versus the integer value, different people had displayed that in different ways over time. Some of it displayed in raw value terms. Some of it displayed in integer terms. As a matter of law, it was obvious in light of what was on sale. There was never any argument. But in spite of that, it was still covered by Model C, wasn't it? Your Honor, I'm sorry? The Delta L was still covered by Model C because it was relevant change in inductance over real time. So that's still Delta L. The Model C as sold definitely included that. But back in February. I believe it did. And in any event, even if there were any doubt about that, as a matter of law, it would have been obvious in light of what was on sale. And the on-sale bar equally invalidates that which was obvious in light of what was on sale. But I think the jury at least was entitled to find that it itself had been conceived enough to the point where it could be explained to one school in the art, which took very little to do. Thank you, Your Honor. Mr. Rounce, you have rebuttal time. Thank you, Your Honor. There's certainly more to this invention than counsel's pretending. The claims clearly indicate that there is more than just a display on a vehicle detector with function switches. They also refer to the display of parameters, function states, and parameter values. That's also a component of Claim 1. And of course, the dependent claims talk about other critical features of this invention. But did Mr. Seagate testify that these Claim 1 limitations were satisfied? Absolutely not. And the court can read that testimony for itself. The only thing that Mr. Seagate testified on those two pages of sketchy transcript is that function states and parameters could be displayed on the preliminary drawing of the LCD display. And that was completely uncorroborated. But that doesn't cover Claim 1. There's no mention of whether the oscillator circuit was done. And you could hook it up to an oscillator circuit and perform that invention. Nothing. And it certainly didn't include delta L. In fact, the testimony of Mr. Seabury was that Mr. Potter wanted that changed later, that they scrapped that early display. And they went to a new one later that displayed delta L. And in fact, that initial drawing was scrapped fairly early on. And the court can see from the Standish invoices that are in the record that the company went through a number of displays. But it is very clear that the court could not take Mr. Seabury's testimony. Let me ask you a question about going back to the inventor's testimony here that we were talking about before. This is on page 1983. His testimony, I take it, and with reference to the product mentioned in the letter, and he's asked about the product that he was promising to provide some quantities by the first of May and production quantities by mid-July. And he says that those production quantities of your new LCD display vehicle detector are true. That is what we were trying to achieve, yes. He's referencing the Model C at that point, correct? Or what ultimately became the Model C? Certainly, he's not referring to the Model C in the letter to Mr. Potter. No, but that testimony links up, it seems to me. Or perhaps it doesn't, but if not, tell me why. The Model C with the products mentioned in the letter. The testimony was at trial. We certainly don't dispute it. Okay, but does it not link up, the products mentioned in the letter with the Model C? What ultimately became the Model C is Mr. Potter's testimony on J.A. 1983. What he's saying is that at that point in time, in the time of the letter, it was in development. He certainly wasn't telling Mr. Lamarock that I've got a Model C detector ready for you. When he was quizzed by counsel, his testimony was, yes. Internally at Reno 80, we called it the Model C, and we had this product in development. That was the testimony. With respect to the Model C documentation, which is at page 3732 of the joint appendix, that's dated February 13, 1996. Let's talk about that. If we take a look at page 3735, I think there was a Delta L change in inductance that's mentioned there. If I understand you correctly, you had said that the Delta L did not come out until after, at the request of other folks who wanted the Delta L indication. But that was already disclosed in the Model C papers that are dated February 13, 1996. That's not correct, Your Honor. What this is referring to is using the Delta L equation to set the sensitivity levels. This is not discussing the display of Delta L specifically. So what they're talking about here is how we're going to set the sensitivity settings in the unit using this equation, but this is not referring to a change in loop inductance. But you're just changing the loop inductance. That's all you're reflecting in the Delta L. That's correct. But the display of that had never been done before. That's our point, and it's a requirement of the claim. One of the claims. Yes, that's correct. So what does that auto-sensitivity mean then on page 3735? We will assume that a motorcycle will cause a 1% change to that for the standard car. We'll keep track of the maximum and minimum deviation of Delta L. That's not a reflection of the Delta L that eventually was incorporated? Now, I believe it is with respect, again, to calculating sensitivity. So you've got eight sensitivity levels, and you use the Delta L to set each different level of sensitivity. But the display of Delta L itself is not a portion of this. And that was done when a vehicle detector would go over the loop. Then you can tell what's been the change in loop inductance, and it would be reflected to the user. And that's different from what's going on here in this manual. Well, that's not a manual. I thought these were terms and conditions of the Model C. Actually, thank you for correcting me. This is a preliminary proposed functionality of what the Model C may use. That's what this document was. And just to follow up in the questions earlier, there was no witness who took this document and testified to it at trial. Mr. Seabury wasn't asked one question about this document. The only evidence in the record was from Mr. Potter. And he testified that, based upon this document, it wasn't ready for patenting for a lot of different reasons. Very well. Do you have nothing further? I have nothing further. Thank you very much. Thank you. Thank both counsel. The case is submitted.